[No. 15032.  Department One.  January 6, 1919.]

PHILIP OLNEY et al., Respondents, v. W. D. McNAIR et al., Assessor and Treasurer of Yakima County, Appellants.[1]

TAXATION (2) — POWER OF STATE — INDIANS (10-1) — PERSONAL PROPERTY. Sheep and their increase, purchased with the proceeds of stock and its increase issued by the United States Government to an Indian upon a reservation as a ward of the government, are not subject to taxation; as the Indian is a ward of the government, which does not part with title by the issuance of property to him.

SAME. The fact that money was borrowed to care for the sheep, or that the owner had prospered and was an officer in a bank, does not discredit his direct evidence that no stock was ever purchased except with proceeds of issued property and its increase, or make him any the less a ward of the government.

Appeal from a judgment of the superior court for Yakima county, Taylor, J., entered March 28, 1918, in

[1] Reported in 177 Pac. 641.

favor of the plaintiffs, in an action to enjoin the collection of a tax, tried to the court. Affirmed.

*O. R. Schumann* and *J. Lenox Ward,* for appellants.
*Carroll B. Graves,* for respondents.

TOLMAN, J.—This is an appeal from a judgment setting aside as invalid and void the assessment and levy of taxes against certain personal property of respondents, and perpetually enjoining any attempt to collect the same.

Respondents, who are husband and wife, are of Indian blood, and are members of what is known as the Yakima Indian nation, or tribe, and reside on allotted lands still held in trust for them by the United States, in the Yakima Indian reservation, Yakima county, Washington. Appellants are the assessor and treasurer of Yakima county. It is alleged and admitted that, in the year 1917, the assessor listed and assessed, as the personal property of respondent Philip Olney, 1,500 sheep, placing an assessed valuation of $6,000 thereon, and caused such assessment to be placed upon the tax rolls of the county for the purpose of the levying and collection of taxes thereon, and that taxes have been levied thereon according to the rate fixed for Yakima county, and that the same have been certified to the county treasurer for collection.

The complaint alleges:

"That the personal property aforesaid is the increase of personal property issued to the plaintiff Philip Olney by the United States pursuant to the acts of Congress providing therefor, and also was purchased with the rents, issues and profits from the allotments to plaintiffs, and said personal property consists wholly of said issued property and the increase and profits thereof and derived therefrom and derived

from the rents, issues and profits of the allotments to plaintiffs.''

And further, that the listed and taxed property is not liable to taxation by Yakima county; all of which is denied by the answer. The proof tends strongly to show that Charles Olney, the father of respondent Philip Olney, while but a boy, went upon the reservation as early as 1865, and has since remained there; that he had nothing when he went there, that he attended the Indian school, worked as directed during school time and vacation, received his board and clothing, and that, after a time, the agent in charge issued to him three cows and a heifer, the first property which he ever had, and these with the increase amounted to some thirty head at the time of what is known as the Priestley issue. About the year 1889, Captain Priestley, then the agent in charge, having on hand a considerable number of cattle belonging to the United States, and branded ''ID,'' signifying ''Indian Department,'' assuming that the Indians had made such progress towards self-support as to warrant that action, and apparently acting under general orders from the government, made a general issue of cattle to the Indians then on the reservation, calling in the heads of families, ascertaining the number of children in each family, and basing the issue of cattle thereon. And, according to the testimony of Charles Olney, several head of cattle were then issued to him for himself, his wife, and his four children. The officer delivering the cattle to him specified which ones were for each individual member of his family; and while these cattle were run all together, and with those which Charles Olney formerly possessed, yet each child was taught to know its own cattle and the increase thereof, so that each member of the family,

at all times, knew which cattle belonged to each member of the family. From time to time, steers and dry cows were sold, and the proceeds of the sales of those belonging to each child were invested in heifers, so that the number belonging to each child continued to increase.

About the time that Philip Olney became of age, it was found that he possessed some thirty or forty head of cattle, and at that time he began to distinguish his cattle from his father's, using his father's brand, but placing it in a different position or place upon his animals, so that they were always readily distinguishable from those belonging to his father and other members of the family. He continued to run his cattle with his father's, however, until about the year 1902, when the cattle were all sold, both his and his father's, and the proceeds of the sale were invested in sheep. Philip Olney, his father, and an uncle all invested in sheep, and handled their sheep together in a sort of partnership. In 1906, the uncle withdrew from the partnership and took away his share of the sheep and in 1915, Philip and his father divided the sheep, which they had held in common after the uncle withdrew, and each has since handled his affairs separately. All of the sheep now assessed as the property of respondents were acquired in the manner stated. Philip Olney never worked for wages or earned money except in caring for his stock; and his father, while having earned money by riding the range and as captain of the Indian police, testifies that all such earnings were used to support his family, as also was a considerable portion of the money which he derived from the sale of his issued stock and its increase. All of the testimony is to the effect that no stock was bought by Philip or his father except with the proceeds of the

sale of issued stock or its increase. It is admitted that, at the time Philip came of age, or when he married, his father and mother each gave him a cow or calf, so that he got a little more than his share of the stock. But we do not consider this of sufficient importance to change the situation or to interfere with the finding that the sheep assessed were, as alleged in the complaint, acquired from the increase of personal property issued to Philip Olney by the United States.

From the very beginning, the Federal Government has treated Indians and Indian tribes as wards of the nation, and they have at all times been under the care and control of a department specially charged with the duty of looking after their affairs, with the avowed intent and purpose of encouraging habits of industry, inducing them to engage in the raising of stock and the cultivation of the soil, to the end that they may become not only self-supporting, but useful, productive, and civilized members of the community in which they live. While, strictly speaking, no such thing as a tribal government now exists, or perhaps ever existed on the Yakima reservation, yet the residents thereof of Indian blood are, none the less, wards of the nation. In ordinary affairs, the individual who has shown ability so to do is, no doubt, permitted to conduct his own affairs. But the right and power of supervision still remains in the Federal government and may be exercised at any time. In the issue of personal property, the government does not part with its title absolutely, and may, whenever it sees fit, step in and prevent the sale or disposition thereof by its ward who is in possession, or may retake it entirely if deemed advisable.

The sole question here is whether such property is liable to taxation by the officers of the county where it

is situated. In *United States v. Rickert,* 188 U. S. 432, the late Mr. Justice Harlan, in answering this question, said:

"The personal property in question was purchased with the money of the government and was furnished to the Indians in order to maintain them on the land allotted during the period of the trust estate, and to induce them to adopt the habits of civilized life. It was, in fact, the property of the United States, and was put into the hands of the Indians to be used in execution of the purpose of the government in reference to them. The assessment and taxation of the personal property would necessarily have the effect to defeat that purpose."

It has also been squarely held that not only the issued property is exempt from taxation for the reasons above mentioned, but also, and for the same reasons, the increase of the issued property, property purchased with the proceeds of the sale of the issued property, and property purchased with the proceeds of the sale of increase of issued property, is likewise exempt. *United States v. Pearson,* 231 Fed. 270. The case just cited reviews the authorities, treats the subject exhaustively, and announces a rule of law which should be, and is, decisive here.

We find nothing in the record which in anywise disputes, or even casts suspicion upon, the testimony offered to show that the property involved was all acquired with the proceeds of issued property and the increase of issued property. The fact that money was borrowed from time to time for use in the lambing season and to care for the sheep, does not raise a presumption that it was used for other purposes, so as to discredit the direct testimony of the witnesses that none of it was used to purchase stock, and that no stock of any kind was ever purchased by them except with the proceeds of issued property or increase

of issued property. The fact that Philip Olney appears to be a man of intelligence and of some education, that he has prospered in his affairs, or even that he is an officer and stockholder of a bank, does not overcome this testimony or make him any the less a ward of the government.

The judgment is affirmed.

MAIN, C. J., MACKINTOSH, MITCHELL, and CHADWICK, JJ., concur.